FRANK CEDRONE AND LENORA CEDRONE, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cedrone v. Commissioner
Docket No. 3203-78.
United States Tax Court
T.C. Memo 1986-89; 1986 Tax Ct. Memo LEXIS 518; 51 T.C.M. (CCH) 555; T.C.M. (RIA) 86089; March 5, 1986. *518 Held: Amounts owed to petitioners and deposited in accounts held by petitioners, or paid in satisfaction of petitioners' personal obligations or the obligations of their wholly owned corporations, constitute income to petitioners. Held further, petitioners are entitled to a section 166(d) nonbusiness bad debt deduction for the payment of a wholly owned corporation's obligations. Held further, petitioners are entitled to a section 165 loss deduction on the sale of property held for use in their trade or business. Held further, petitioners are liable for additions to tax pursuant to section 6653(b). Frank Cedrone and Lenora Cedrone, pro se. George W. Connelly, Jr., for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income tax for the years and in the amounts indicated: Addition to Tax
Petitioner
Year
Deficiency
Section 6653(b) [1] *519 Frank Cedrone
1970
$4,622.79
$2,311.39
Frank Cedrone &
1971
221,730.81
110,865.41
Lenora Cedrone
1972
15,913.48
7,956.74
The issues presented for decision are: (1) Whether petitioners received unreported income in each of the years at issue; (2) whether petitioners are entitled to a deduction for: (a) payments made as guarantors of a wholly owned corporation's debts; (b) losses incurred on the sale of a wholly owned corporation's plants, trucks, and trailers; (c) losses incurred on the sale of property held by petitioners for use in their trade or business; and (d) restitution payments made to the Town of Fleming in 1976; (3) whether Lenora Cedrone is entitled to relief from liability pursuant to the section 6013(e) innocent spouse provisions; (4) whether petitioners are liable for additions to tax pursuant to the section 6653(b) civil fraud addition. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Frank Cedrone (Cedrone) and Lenora Cedrone (Mrs. Cedrone), husband and wife, were married at all times relevant to this case. They resided in Fulton, New York, at the time they filed their petition herein. Petitioners *520 are the parents of two sons, Frank Cedrone, Jr. and Peter John Cedrone, who were petitioners' dependents during the years at issue. This case is based upon two statutory notices of deficiency. The first notice was issued to Cedrone and relates to the taxable year 1970. Petitioners filed separate returns for 1970, and Mrs. Cedrone's return is not at issue. The second notice was issued to petitioners and relates to the taxable years 1971 and 1972, in which they filed joint returns. Cedrone was engaged in the construction business in New York from approximately 1951 through the years in issue. He pursued this business as president and owner or sole shareholder of a number of unincorporated companies or incorporated entities, the following of which are relevant to the issues before us: (1) Chesterlyn Pipe Line Co., Inc. (Chesterlyn). Chesterlyn was experiencing financial difficulties during the years at issue, and was liable for numerous liens and judgments; (2) Quality Redi-Mix Co., Inc. (Quality Mix); (3) Bar-Lum Soil Systems, Inc. (Bar-Lum); (4) Quality Pipe Line Co. (Quality Pipe). Mrs. Cedrone graduated from high school and attended 1 year of business school. After graduation, *521 she went to work for her father's business, Massaro Company, Incorporated (Massaro). Her father died in 1963, at which time responsibility for the operation of Massaro devolved upon Mrs. Cedrone, her sisters, and her brother. Mrs. Cedrone continued to work for Massaro until the business went bankrupt in 1969. In February 1969, a resolution was passed to create a sewer district in the Town of Fleming, County of Cayuga, New York. The project was estimated to cost $2,500,000. Bids were first let in June 1970, at which time the lowest bid received was $2,700,000; all bids were rejected as excessive. Due to liens filed against Chesterlyn and his other businesses, Cedrone was unable to participate in the June 1970 bidding. Revised bids were to be opened in October 1970. Between the June and October bids, Cedrone was encouraged by Vito M. Pastore (Pastore) and Louis Contiguila (Contiguila) to enter a bid on the Town of Fleming Sewer Project (Sewer Project). At that time, Pastore was the legal representative for the Town of Fleming. Cedrone estimated that the work could be done for roughly $1,500,000. Kenneth C. Marshall (Marshall) owned and operated J&K Pipe Co. (J&K). After discussions *522 between Cedrone and Marshall, it was agreed that J&K would submit a bid pursuant to Cedrone's estimate. Additionally, Cedrone and Marshall agreed that if J&K was awarded the project, Cedrone would serve as project manager and would be paid 10 percent of the gross contract price plus $400 per week. The 10-percent commission constituted a bonus for Cedrone's services as project manager and rent for J&K's use of Quality Mix's construction equipment. J&K's October 1970 bid of $1,532,069 was the lowest received. The J&K bid was defective, however, because it did not include a bid bond. The Fleming Town Board agreed to accept the bid if a performance bond could be obtained. Pastore subsequently advised the Fleming Town Board that the performance bond requirements had been satisfied, and the project was awarded to J&K on October 26, 1970. On that date, an Agreement for Construction of Sanitary Sewers was entered into between Marshall d/b/a J&K and the Town of Fleming in the amount of $1,532,069. Marshall formed and incorporated Ron-Ore Soil Systems, Ltd. (Ron-Ore) in New York State on December 3, 1970. The name Ron-Ore was derived from the names Cedrone and Pastore. Upon its formation, *523 Ron-Ore assumed J&K's contract with the Town of Fleming. Cedrone served as project manager for J&K and Ron-Ore for the duration of the Sewer Project. Additionally, during June or July 1971, Cedrone assumed the position of President of Ron-Ore, and remained in that position throughout Ron-Ore's work on the project. Neither petitioner was ever a shareholder in Ron-Ore. Beginning in July 1971, a disbursement journal (check listing) was maintained for Ron-Ore by Mrs. Cedrone or her sister, Carrie Orlando. Additionally, during the period November 1970 through October 1972, Mrs. Cedrone prepared the weekly payroll ledgers for Ron-Ore, cards for each of the employees, and quarterly payroll tax returns. She had been unemployed since the bankruptcy of Massaro. On the advice of her doctor, she sought limited employment as therapy for her depression resulting from the bankruptcy of Massaro and attendant family disagreements. Mrs. Cedrone accepted Marshall's offer of employment on the condition that she be allowed to work at home. Her two sons were living at home, and she did not want to commute from Fulton to Fleming, a distance of approximately 40 miles. During the taxable years 1970, *524 1971, and 1972, the Town of Fleming paid Ron-Ore or certain specified parties $150,159.60, $1,356,514.63, and $134,292.60, respectively, pursuant to the Sewer Project contract. Between November 10, 1970, the date of the first check, and January 28, 1972, the checks were made payable to J&K, although they were deposited in Ron-Ore's bank accounts. Ron-Ore maintained three bank accounts during the years at issue. Two of the accounts were with the Marine Midland Bank of Central New York: Account Number XXX-XX321-6 (Marine Account I) was in the name of Ron-Ore care of Cedrone and only Cedrone was authorized to sign checks on this account; Account Number XXX-XX102-7 (Marine Account II) was in Ron-Ore's name and only Marshall and "George Sedrick" [2] were authorized to sign checks on this account. [3] *525 Ron-Ore had a third account with the First National Bank of Waterloo (Waterloo account) and only Cedrone was authorized to sign checks on this account. Ron-Ore did not file corporate tax returns for the years 1970, 1971, or 1972. Additionally, formal corporate records of Ron-Ore for the period December 1970 through June 1971, and from April 1972 through December 1972, do not exist.Whatever records Ron-Ore did maintain during 1971 and 1972 were turned over to New York State for its criminal investigation of the Sewer Project. Quality Mix also failed to file corporate tax returns for the years at issue. Petitioners opened or maintained at least 10 checking or savings accounts during the years at issue. These accounts were either in petitioners' names, or were held in trust by them for their sons. A large number of checks were drawn upon one of the three Ron-Ore accounts and were deposited in one or more of the accounts maintained by petitioners. A number of the checks run from Ron-Ore to companies owned by Cedrone, or to creditors of companies owned by Cedrone. Additionally, numerous checks were payable to fictitious payees. A chronological synopsis *526 of these transactions as stipulated by the parties is set forth below. Specific Transactions - 1970
The following checks were drawn on Ron-Ore's Marine Account II. Check
Number
Amount
Payee
Application of Funds
107
$4,000.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
243
$3,500.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
244
$3,500.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
242
$3,500.00
James Rello
A fictitious payee. In addition to the specific transactions listed above, checks totaling $11,660.01 were drawn on the account of Quality Mix and were applied in whole or in part for petitioners' benefit. Specific Transactions - 1971
The following checks were drawn on Ron-Ore's Marine Account II: Check
Number
Amount
Payee
Application of Funds
411
$10,000.00
Williams Co.
A fictitious payee. $5,000 was
given to Pastore. $5,000 was
deposited by Mrs. Cedrone in a
savings account held in Cedrone's
name.
573
$ 600.00
Springer
Used by Cedrone as a down payment
Cadillac
on a Cadillac automobile.
843
$ 9,055.44
Springer
Used by Cedrone to pay the balance
Cadillac
due on the Cadillac automobile.
796
$ 7,500.00
Quality Co.
Deposited in an account held in
the name of "Frank Cedrone or
Lenora Cedrone in trust of Peter
Cedrone."
909
$26,991.00
Carrie
Used to pay purchase price, filing
Orlando
fees, and taxes on petitioners'
house.
1009
$ 7,500.00
Frank & Lenora
Payment of principal and late
Cedrone & the
charge on loan for dump truck and
Lincoln National
backhoe.
Bank
913
$10,000.00
Cedrone
Used to purchase two bank checks
which were deposited in a savings
account held in Cedrone's name.
1119
$10,000.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
1127
$ 1,200.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
1136
$ 500.00
Carmella Massaro
Carmella Massaro is Mrs. Cedrone's
mother; the check was a gift to
her.
1137
$17,601.79
Jefferson Lewis
Used to satisfy an outstanding
Savings and Loan
mortgage on real property owned by
Mrs. Cedrone.
1181
$ 1,673.68
Cash
Deposited in an account held in
the name of "Frank Cedrone or
Lenora Cedrone in trust of Peter
Cedrone."
1291
$10,000.00
Jack Carr
A fictitious payee. The check was
endorsed by Cedrone and deposited
in an account held in Cedrone's
name.
1326
$10,000.00
Cedrone
Deposited in an account held in
Cedrone's name.
1349
$ 4,000.00
Jack Williams
A fictitious payee.The check was
endorsed by Cedrone and deposited
in an account held in Cedrone's
name.
1350
$ 890.00
Fred Young
A fictitious payee. The check was
endorsed by Cedrone and
subsequently cashed by him.
1353
$ 1,000.00
Cedrone
Cashed by Cedrone.
1443
$32,500.00
Bar-Lum
Deposited in an account held in
the name of Bar-Lum. This payment
represents a portion of Cedrone's
10% commission on the Fulton sewer
project.
1444
$28,000.00
Bar-Lum
Deposited in an account held in
the name of Bar-Lum. This payment
represents a portion of Cedrone's
10% commission on the Fulton sewer
project.
1530
$ 4,281.24
Cash
Cashed by Cedrone.
1630
$ 683.68
Frank & Lenora
Used to make payment on
Cedrone & Lincoln
peitioners' loan from Lincoln
National Bank
National Bank.
*527 The following checks were drawn on Ron-Ore's Marine Account I. Check
Number
Amount
Payee
Application of Funds
3
$2,500.00
Cedrone
Cashed by Cedrone.
6
$1,500.00
Cash
Cashed by Cedrone.
2011
$ 500.00
Cedrone
Cashed by Cedrone.
2021
$3,000.00
Leonard Cedrone
Applied in satisfaction of various
debts outstanding against
Chesterlyn.
2060
$2,300.00
Leonard Cedrone
Applied in satisfaction of various
debts outstanding against
Chesterlyn.
2163
$1,540.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
2264
$3,600.00
Cedrone
Cashed by Cedrone after having
been endorsed by both petitioners.
2290
$2,500.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
2292
$2,500.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
2388
$1,500.00
Cedrone
Deposited in a savings account
held in the name of "Lenora in
trust for Cedrone."
2396
$4,000.00
Cedrone
Applied in full settlement of a
claim by Utica Mutual Insurance
Company against Cedrone and
Chesterlyn.
2071
$4,359.00
Angelo L. Cedrone
Applied in satisfaction of various
debts outstanding against
Chesterlyn.
2166
$ 508.00
Smith Bros.
$100.00 of this amount constituted
income to petitioners.
2404
$ 840.64
Bergan Electric
$350.00 of this amount
constituted income to
petitioners. The following *528 checks were drawn on Ron-Ore's Marine Accounts I and II in the gross amounts indicated. The checks were payable to "payroll-cash" or "cash-payroll" and the proceeds were used to satisfy Ron-Ore's net payroll obligations. All checks were cashed by Mrs. Cedrone, with the exception of check number 2374, which was endorsed by Cedrone and a third person, and check number 2376 which was endorsed and cashed by Cedrone. Generally, Mrs. Cedrone would telephone Marshall to determine the number of hours worked by each employee during a pay period. Cedrone would then deliver to Mrs. Cedrone a presigned but otherwise blank check drawable upon a Ron-Ore account. Mrs. Cedrone would complete and cash the check, stuff the payroll envelopes, and deliver the gross amount in excess of net payroll obligations to Cedrone. Payroll checks included amounts for both employee bonuses and job purchases. Ron-Ore's employees were paid a bonus of 10 cents per lineal foot of pipe laid. Job purchases included trowels, shovels, picks, cement, pails, boots, and raincoats needed for completion of the job. Additionally, payments were made to a union agent to ensure an adequate supply of labor. Check
Gross Amount Included
Number
Gross Amount
Net Payroll
in Income [4] *529 2006
$6,305.31
$4,453.71
$2,378.61
2023
4,734.31
4,344.31
390.00
2066
6,018.37
5,107.72
1,113.40
2071
4,777.89
4,662.29
115.60
2084
5,890.08
4,390.08
1,500.00
2112
4,944.40
4,298.10
646.30
2132
5,739.18
5,539.18
200.00
2150
5,182.86
4,982.86
200.00
2161
5,692.85
5,492.85
200.00
2186
8,837.73
5,012.73
3,825.00
2214
6,201.26
5,401.26
800.00
2231
7,075.16
6,775.16
300.00
2247
6,964.26
5,551.88
1,412.38
2268
5,570.80
5,327.57
500.00
2300
4,342.96
4,812.06
1,093.40
2311
3,671.70
3,171.70
500.00
2317
3,833.34
3,533.34
300.00
2342
3,928.93
3,628.93
300.00
2374
6,500.00
3,463.53
3,036.47
2376
4,714.69
3,897.39
817.30 For the year 1971, the disbursement journal indicates that some or all of the gross amount in excess of net payroll obligations for the following payroll checks were used for employee bonuses or job purchases. 1971
Check
Number
Application of Funds
Amount
2006
Employee Bonus
$2,293.25
2023
Job Purchases
390.00
2066
Job Purchases
1,013.00
2071
Job Purchases
100.00
2084
Job Purchases
1,500.00
2112
Job Purchases
500.00
2132
Job Purchases
200.00
2161
Job Purchases
200.00
2186
Employee Bonus
3,425.00
2214
Job Purchases
800.00
2231
Job Purchases
300.00
2247
Job Purchases
[5] *530 1,412.38
2300
Job Purchases
1,000.00
2311
Job Purchases
500.00
2342
Job Purchases
300.00
2374
Job Purchases
3,036.47
2376
Job Purchases
800.00
$17,770.10
Specific Transactions - 1972
The following checks were drawn on Ron-Ore's Marine Account I: Check
Number
Amount
Payee
Application of Funds
2460
$ 500.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
2461
$ 500.00
Cedrone
Deposited in a savings account
held in Cedrone's name.
2503
$1,300.00
Cash
Endorsed by Mrs. Cedrone; used to
purchase $800 in travelers checks
and pay an $8 service fee. The
balance was taken in cash.
2506
$3,959.80
Spector Genesee
Used as a down payment on a
Motor Sales, Inc.
Cadillac automobile purchased by
Cedrone in the name of Bar-Lum.
2514
$4,000.00
Cash
Endorsed and negotiated by Cedrone
for teller's checks and cash.
Teller's checks used to pay for
appliances, heating, plumbing, and
assorted improvements to
petitioners' home. The following checks were drawn on Roe-Ore's Waterloo Account: Check
Number
Amount
Payee
Application of Funds
112
$ 560.83
DeSpirtito Lumber
Used to purchase stone, slate, and
and Mason
other materials for petitioners'
Supplies, Inc.
residence.
124
$ 137.50
Frank E. Black
Used to pay for gardening work
Nursery
performed at petitioners'
residence.
133
$1,156.94
Armour Alarm
Used to pay for an electrical
Systems
protection system and one year's
service thereon at petitioners'
residence.
139
$ 637.00
Thermasol Ltd.
Used to purchase a steam generator
for petitioners' residence.
146
$2,254.60
Cash
Used to pay for petitioners' home
improvements.
174
$ 110.40
Fulton Builders
Used to pay for petitioners' home
Supply Co., Inc.
improvements.
203
$ 607.32
Cash
Deposited in a savings account
held in the name of "Mrs. Cedrone
in trust for Cedrone."
209
$ 197.94
Bailey Electric
Used to pay for the installation
Service
of fixtures and wiring at
petitioners' residence.
212
$ 101.65
John LaManna
Used to pay for flowers at the
& Son
funeral of Cedrone's brother.
213
$ 90.95
Anthony's Flower
Used to pay for flowers at the
Shop
funeral of Cedrone's brother.
225
$ 123.91
McDonald's Wallpaper
Used to purchase wallpaper and
& Paint
other materials for petitioners'
residence.
217
$ 493.10
DeSpirito Lumber,
Used to purchase miscellaneous
Inc.
building materials.
232
$ 308.36
Erie House of
Used as partial payment on various
Kitchens, Inc.
items for petitioners' residence.
196
$ 404.37
Fulton Builders
Used to purchase panelling and
Supply, Inc.
materials for petitioners'
residence.
182
$ 245.67
Bailey Electric
Used to purchase lighting fixtures
Service
and other materials for
petitioners' residence.
200
$1,673.00
Perro & Sons,
Used to satisfy part of the cost
Inc.
of the funeral of Cedrone's
brother.
173
$2,000.00
Elmer Shaw & Co.
Used to pay accounting services
for Chesterlyn.
233
$1,490.46
Ramsey G.
Used to pay for legal services for
Ludington
Chesterlyn.
*531 The following checks were drawn on Ron-Ore's Marine Account I or Waterloo account in the gross amounts indicated. The checks were payable to "cash-payroll" and the proceeds were used to satisfy Ron-Ore's net payroll obligations. Mrs. Cedrone endorsed and cashed all checks other than checks numbered 137, 152, 2501, and those endorsed by Cedrone. Cedrone endorsed checks numbered 2459, 2463, and 2471, which were then cashed by a third party. The procedure for cashing the payroll check and disbursing the funds was generally the same as that described for 1971. Check
Gross
Gross Amount Included
Number
Amounts
Net Payroll
in Income [6]
2459
$1,931.50
$1,631.50
$ 300.00 2463
1,598.40
1,298.40
300.00 2471
1,655.35
1,264.83
408.52 2501
960.40
1,814.52
(707.82)
135
1,300.53
1,100.35
200.00 137
1,303.58
1,103.58
200.00 141
1,619.79
1,119.79
500.00 145
1,281.26
1,001.26
280.00 151
915.78
715.78
200.00 152
1,526.27
826.27
700.00 154
905.98
605.98
300.00 155
689.42
489.42
200.00 161
1,374.75
1,024.75
350.00 162
1,364.49
1,018.57
314.00 $3,544.70 For *532 the year 1972, the disbursement journal indicates that some or all of the gross amount in excess of net payroll obligations for the following payroll checks were used for job purchases. 1972
Check
Number
Application of Funds
Amount
2459
Job Purchases
$ 300.00
2463
Job Purchases
300.00
2471
Job Purchases
[7] 408.52
$1,008.52
Rental Income - 1971 and 1972
Prior to her father's death, Mrs. Cedrone acquired an interest in two pieces of real property. The first piece of property was a building in Chaumont, New York, leased by the United States as a post office. Mrs. Cedrone and her father undertook the building's construction in 1961-1962. Her father bequeathed his interest in the post office to her at his death.During 1971 and 1972, rents totaling $2,768.02 and $2,715.57, respectively, were paid to Mrs. Cedrone with respect to this facility. Neither income, nor expense or depreciation deductions, associated withthis property were reported by petitioners during 1971 or 1972. The outstanding *533 mortgage on the building was called by the Jefferson Lewis Savings Bank in 1971. Cedrone wrote a check for $17,601.79 in satisfaction of this obligation. The second piece of property was a house built for Mrs. Cedrone by her father, title to which remained in his name at the time of his death. As a result of acrimonious relations between Mrs. Cedrone and her brother, Mrs. Cedrone was forced to pay $26,991 to acquire title to the property. A check in this amount was written by Cedrone to Carrie Orlando, Mrs. Cedrone's sister, in 1971. Various Payments, Judgments, and Sales
Between 1969 and 1973, numerous judgments were filed against Chesterlyn, and against petitioners as owners thereof. During 1971, Ron-Ore made payments in the amounts indicated below in satisfaction of these judgments. Payee/Recipient
Amount
Equipment Finance Co.
$3,000.00
Johns-Manville
2,300.00
Utica Mutual Insurance
4,000.00
Cedrone posted a performance bond with Utica Mutual Insurance Company (Utica) as guarantor of a construction job undertaken by Chesterlyn. The performance bond was in the form of a $15,000 certificate of deposit issued by Merchants National Bank and Trust Company. Chesterlyn defaulted on its *534 obligations, and in 1970, Utica foreclosed on the performance bond in partial satisfaction of Chesterlyn's debts. Additionally, improved real property owned by Cedrone and located in the Town of Scriba, New York, was levied upon by the Sheriff of Oswego County to satisfy a judgment obtained against Cedrone by Johns-Manville Sales Corporation relative to obligations of Chesterlyn. This property was sold at public auction during February 1970 for $4,950. The property sold included 25 acres of land purchased by Cedrone for $1,000, and held in his name. Cedrone improved the land with 8 to 10 feet of gravel landfill covering an area approximately 300 feet long and 150 feet wide. Cedrone estimated that he used 10,000 to 15,000 cubic yards of gravel at a cost of approximately 80 cents a yard. A building was placed on the landfill at a cost of approximately $17,000, and a well and heating system cost an additional $6,000. The building was used by Cedrone to store construction equipment. Quality Mix purchased a Redi-Mix plant from H. L. Baughman in 1969. It paid $5,000 for the plant, which was located in Buffalo, New York, and an additional $10,000 to relocate the plant to property rented *535 from New York Central Railroad in Fulton, New York. The plant was sold by Quality Mix to Rizzo Construction Company (Rizzo) in the fall of 1970 for $15,000. Included in the sale were several Redi-Mix trucks and a trailer purchased by Quality Mix subsequent to its acquisition of the plant. Legal Proceedings
The Town of Fleming instituted suit against Cedrone, Ron-Ore, and others relative to their participation in the Sewer Project. This lawsuit was settled during 1976, and the terms of settlement included the payment by Cedrone of restitution in the amount of $150,000. On May 8, 1974, a Federal Grand Jury for the Northern District of New York returned a five-count indictment against petitioners. At their arraignment, both petitioners entered pleas of not guilty to all charges. On September 15, 1975, Cedrone entered a plea of guilty to Court II of that indictment, which charged a violation of section 7201 for 1972, and he was thereupon convicted of that charge. The remaining counts against petitioners were dismissed. OPINION We must initially determine whether petitioners received unreported income for each of the years at issue, and if so, in what amount. Respondent asserts that *536 petitioners failed to report as income amounts withdrawn from Ron-Ore and Quality Mix which directly or indirectly accrued to petitioners' benefit. Respondent's determination of a deficiency is presumptively correct, and petitioners bear the burden of proof in demonstrating otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). It is a settled rule of law that where a taxpayer's records are inadequate, unreliable, or nonexistent, respondent may reconstruct income using any method which will, in respondent's opinion, clearly reflect income. Section 446(b); Holland v. United States,348 U.S. 121 (1954); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Harper v. Commissioner,54 T.C. 1121 (1970). The only restriction on this rule is that the method adopted must be reasonable. Stone v. Commissioner,22 T.C. 893, 905 (1954). Respondent contends that funds withdrawn by Cedrone from Ron-Ore and deposited in accounts controlled by him represent service income to Cedrone as president of Ron-Ore and manager of the Sewer Project. Cedrone contends that these amounts represent rental income owed to Quality Mix by Ron-Ore for the use of *537 construction equipment. Cedrone asserts that the payments were deposited in his accounts to allow for the orderly payment of his creditors and the creditors of his wholly owned businesses. We have found that Cedrone agreed with Marshall to serve as manager of the Sewer Project and to rent Quality Mix equipment of Ron-Ore for a commission equal to 10 percent of the gross contract price. No evidence was submitted as to the type or fair rental value of Quality Mix equipment used by Ron-Ore in the sewer project. Neither Quality Mix nor Ron-Ore filed corporate income tax returns for the years at issue, and no evidence has been submitted as to the amount paid by Ron-Ore to Quality Mix for the use of the equipment. Petitioners concede that the funds were withdrawn by them and were deposited in accounts under their control. No attempt was made to segregate funds purportedly belonging to Quality Mix from petitioners' personal assets. We are convinced that no such distinction existed. As owner and president of Quality Mix, and manager and president of Ron-Ore, Cedrone had sole discretion over the allocation of the commission between personal income to him and rental income to Quality Mix. *538 We decline Cedrone's invitation to restructure transactions over which he had complete control. Therefore, we find that respondent's allocation of amounts withdrawn from Ron-Ore and deposited in accounts held in Cedrone's name is reasonable, and that such amounts should be included in petitioners' income for the years at issue. Respondent next asserts that Ron-Ore's payment of petitioners' personal bills constitutes income to petitioners, and we agree. The payment of personal debts as compensation for services rendered constitutes income under the most basic tenets of our taxing system. Section 61(a)(1). See Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929).It is of no significance that payment was made directly to petitioners' creditors rather than first coming under petitioners' control. We find that all checks drown on Ron-Ore's account in payment of petitioners' personal debts constitute income to petitioners in the year paid. Respondent has determined that the gross amount of various payroll checks drawn on Ron-Ore's Marine Account I and Waterloo Account in excess of net payroll obligations represents income to petitioners in 1971 and 1972. Petitioners contend that *539 the gross amount in excess of net payroll obligations was used to pay for employee bonuses and job purchases related to the Sewer Project. During this period, a disbursement journal was maintained for Ron-Ore by Mrs. Cedrone and her sister. This journal indicates the payee, amount, and application of certain funds withdrawn from Ron-Ore accounts. In substantiation of Cedrone's testimony, the journal indicates that $18,878.62 of the gross amount in excess of net payroll obligations was spent on employee bonuses or job purchases. We accept petitioners' explanation of employee bonuses and job purchases. Any construction job the size of the Sewer Project is going to involve unexpected cash expenditures. We hold that petitioners' unreported income for the years 1971 and 1972 should be reduced by $17,770.10 and $1,008.52, respectively, in accordance with the employee bonuses and job purchases recorded in the disbursement journal as indicated in the statement of facts. As to the remainder of these adjustments, petitioners have failed to carry their burden of proof. With the exception of check number 855, which respondent has conceded constitutes a business expense of Ron-Ore and is not *540 includable in petitioners' income, we sustain respondent's finding as to the remaining miscellaneous withdrawals from Ron-Ore and Quality Mix. Excluding the payroll checks, petitioners have wholly failed to meet their burden of proof in demonstrating error in respondent's determinations. Respondent, on the other hand, has constructed a detailed record tracing the withdrawal of funds from Ron-Ore to petitioners, their creditors, or the creditors of their businesses. Although respondent's determination of gross income may not be precise, in a record involving hundreds of checks and more than a dozen bank accounts, no greater precision can be asked for. The approximation of income by respondent is not arbitrary where facts sufficient to support the approximation are shown. Estate of Nitto v. Commissioner,13 T.C. 858, 866 (1949). What uncertainty remains is clearly of petitioners' own making. Petitioner has not disputed respondent's determination of unreported dividends, interest, and rental payments for the years at issue; we find that these also constitute income to petitioners. Having sustained respondent's determination of petitioners' gross income, as modified above, we must *541 next determine the appropriateness of certain deductions claimed by petitioners. Cedrone contends that his payment of $56,285.82 in debts owed by Chesterlyn during 1971 and 1972 entitle him to a "loss" deduction for the year in which the debts were paid. We have found that some of the debts were paid with checks which were drawn on Ron-Ore's account and included in Cedrone's income. Additionally, Cedrone claims a loss of $15,000 for 1970 based on Utica's foreclosure on a certificate of deposit which he pledged as guarantor of a Chesterlyn debt. Respondent allowed a nonbusiness bad debt of $1,000 for the years 1971 and 1972 pursuant to section 166(d). Respondent concedes that Cedrone's payment of Chesterlyn debts may qualify as nonbusiness bad debts, but asserts that they will not impact on petitioners' deficiency for the years at issue because of the section 1211 loss limitations. It is a well settled rule that shareholders are not entitled to pay and claim a deduction for corporate expenditures. Rink v. Commissioner,51 T.C. 746, 752 (1969); Koree v. Commissioner,40 T.C. 961, 965-966 (1963); Kahn v. Commissioner,26 T.C. 273 (1956). Cedrone's expenditures were not those of his *542 own trade or business, but rather were those of Chesterlyn. This is true even when the shareholder owns all or a majority of the corporation's stock and is in complete control of the corporation's affairs. Deputy v. du Pont,308 U.S. 488 (1940); Burnet v. Clark,287 U.S. 410 (1932); Rink v. Commissioner,supra at 750-752. Where payments are made to protect or enhance the value of a person's stock in the corporation, such payments are generally treated as capital contributions. Koree v. Commissioner,supra at 966. Section 166(a) provides that a deduction shall be allowed for any debt which becomes wholly worthless during the taxable year. Section 166(d), however, provides that, in the case of a taxpayer other than a corporation, a loss attributable to the worthlessness of a nonbusiness bad debt shall be treated as a short-term capital loss. Pursuant to section 166(d)(2), a nonbusiness debt is defined as follows: (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness *543 of which is incurred in the taxpayer's trade or business. To be treated as a business debt, the debt such be proximately related to the taxpayer's trade or business. Sec. 1.166-5(b), Income Tax Regs.; Whipple v. Commissioner,373 U.S. 193 (1963). Whether a debt is a nonbusiness or business debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs.
Petitioners have provided no evidence in support of their claim that Chesterlyn's debts were created in connection with petitioners' business as a contractor. We cannot speculate as to what role Chesterlyn played in supplying pipe for the Sewer Project. Therefore, petitioners have again failed to meet their burden of proof. Welch v. Helvering,supra.On the record before us, we hold that petitioners' payment of Chesterlyn's debts does not bear a proximate relationship to petitioners' trade or business. Therefore, such payments (including the certificate of deposit) constitute nonbusiness bad debts pursuant to section 166(d)(2), entitling petitioners to a short-term capital loss as limited by section 1211 [8] *544 for the years 1970, 1971, and 1972. Petitioners claim a loss deduction of $10,000 incurred by Quality Mix on the sale of its cement plant. Petitioners have failed to establish that Quality Mix had a basis in the plant, trucks, and trailers in excess of the $15,000 realized on its sale. Additionally, the property sold belonged to Quality Mix, not petitioners, and any loss should be deducted *545 by Quality Mix. Therefore, we deny this deduction to petitioners. Petitioners claim a loss for the years at issue based upon their payment of $150,000 in restitution to the Town of Fleming in 1976. Respondent has denied this loss because it was not incurred during the years at issue. We hold for respondent. Petitioners are precluded from claiming the restitution as a loss during the years at issue because of the annual accounting concept on which the Federal income tax system is premised. See Burnet v. Sanford & Brooks Co.,282 U.S. 359 (1931); Fox v. Commissioner,61 T.C. 704 (1974). Cedrone contends that he suffered a loss of $25,050 in 1970 on the foreclosure sale of improved property located in the Town of Scriba, New York. Respondent agrees that the sale resulted in a loss. It is well established that we may approximate a deduction where the taxpayer, through inadequate records, has failed to prove the precise amount of such deduction. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930).In this instance, the record establishes facts sufficient to make an approximation. Humes v. United States,276 U.S. 487 (1928). The necessity for making an approximation is a result of petitioners' *546 chronic failure to maintain business records.For this reason, any uncertainty as to the costs of a particular improvement has been decided in respondent's favor. Cohan v. Commissioner,supra. Thus, we determine petitioner's basis in the land and building to be as follows: Land
$ 1,000
Landfill
4,000
Building
17,000
Well & heating
System
6,000
$28,000
The building was used by Cedrone to store construction equipment. It was sold for $4,950. Consequently, we find that Cedrone is entitled to an ordinary loss of $23,050 for the year 1970. This loss equals Cedrone's basis in the property in excess of his amount realized on the foreclosure sale. [9] *547 Having sustained respondent's finding of a deficiency, as modified herein, we must next decide whether Mrs. Cedrone is an innocent spouse under section 6013(e), [10] which provides that, in certain circumstances, a spouse who has filed a joint Federal income tax return will be relieved from liability to the extent that such liability results from a substantial understatement of tax attributable to grossly erroneous items of one spouse. Petitioner has the burden of proving that all requirements for relief from tax as an innocent spouse are satisfied. Rule 142(a); Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). In order for petitioner to qualify for the relief provided by the statute, the following conditions specified in section 6013(e) must be satisfied: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations *548 prescribed by the Secretary, if (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. The preliminary prerequisite for relief under section 6013(e)(1)(A) is that petitioners filed joint tax returns for the taxable years 1971 and 1972. This requirement has been satisfied. The second requirement is that there be a substantial understatement of tax attributable to grossly erroneous items of one spouse. "Grossly erroneous items" in section 6013(e)(1)(B) includes any item of gross *549 income attributable to such spouse which is omitted from gross income. Sec. 6013(e)(2)(A). "Substantial understatement" in section 6013(e)(1)(B), (C), and (D) means any understatement of tax (as defined in section 6661(b)(2)(A)) which exceeds $500. Sec. 6013(e)(3). As discussed above, Cedrone's understatement of tax for the years 1971 and 1972 was substantially in excess of $500. Therefore, Mrs. Cedrone has satisfied the second requirement for relief under section 6013(e)(1)(B) as to the unreported payments made to Cedrone by Ron-Ore.
Section 6013(e)(1)(C) requires Mrs. Cedrone to establish that she did not know or have reason to know of the understatement of tax when she signed the return.In order to meet this burden she must prove (1) that she did not have actual knowledge of the understatement of tax, and (2) that the omission was not of such character as to cause a reasonably prudent person possessed of petitioner's experience and temperament to have known of the omission. These matters of proof are questions of fact. Sanders v. United States,509 F.2d 162, 165 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). *550 Mrs. Cedrone contends that she was experiencing depression during this period due to family and business problems. Though she had failed separately for years prior to 1971 to avoid involvement with her husband's business activities, she failed to study or read the returns filed jointly by them. Mrs. Cedrone claims that her marriage to Cedrone has lasted because of her refusal to interfere in his business affairs. We are convinced that Mrs. Cedrone knew, or had reason to know, that there was a substantial understatement of income in the years 1971 and 1972.Mrs. Cedrone was not inexperienced in business affairs. She played a major role in operating Massaro during the 5 years following her father's death. Even more significantly, she was employed by Ron-Ore during the years at issue to maintain employee payroll records, quarterly tax returns, and compensation reports. Though Mrs. Cedrone never worked in Ron-Ore's company offices, she did have access to all payroll records and was responsible for computing and distributing wages. Participation in business affairs or bookkeeping has consistently been considered a factor in determining whether a spouse has reason to know of omissions *551 from gross income. Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975). Considering Mrs. Cedrone's background in business and accounting, it is unreasonable, if not unbelievable, that she did not even read the joint returns. Mrs. Cedrone's claim of ignorance of an understatement is further undermined by the substantial expenditures made on her behalf.In 1971, Cedrone wrote checks for $26,991.00 and $17,601.79 to purchase Mrs. Cedrone's home and to satisfy the outstanding mortgage on her rental property. These checks were drawn on Ron-Ore's account. Mrs. Cedrone admits that she knew Ron-Ore owed Cedrone and his companies money, but claims that these payments constituted loans by Cedrone to her. Regardless of the arrangements between petitioners--no evidence was submitted to indicate that the payments were in fact loans--Mrs. Cedrone's knowledge of Ron-Ore's obligations to Cedrone are incompatible with her claimed status of innocent spouse. As to 1972, Cedrone paid for numerous improvements to Mrs. Cedrone's house with checks drawn on Ron-Ore's account. Mrs. Cedrone contends that these improvements to her home were made by and for Cedrone. Regardless of *552 the motives behind such improvements, they are manifestations of earned and unreported income. Such unusual or lavish expenditures are to be considered in deciding whether a spouse has reason to know of omitted income. Mysse v. Commissioner,57 T.C. 680, 699 (1972). We find that Mrs. Cedrone knew of the understatement of tax caused by Cedrone's omission of income.Therefore, she fails to meet the third requirement under section 6013(e). Consequently, we need not determine whether, taking all of the facts into consideration, it would be inequitable to hold her liable for the deficiency attributable to the omissions of income. We hold for respondent on this issue. The next issue for decision is whether petitioners are liable for additions to tax for fraud pursuant to section 6653(b) for each of the years in issue. We recognize that fraud is not imputed from one spouse to another. Section 6653(b)(4); Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner,56 T.C. 213, 227 (1971). Respondent has the burden of proving fraud by clear and convincing evidence. Rule 142(b); sec. 7454(a); Miller v. Commissioner,51 T.C. 915, 918 (1969). *553 In order to prove fraud, respondent must show that petitioner intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Additionally, respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, petitioner's entire course of conduct can often be relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. Petitioner's failure to come forward with evidence to dispute respondent's determination of deficiencies for the years in issue is not determinative of fraud, *554 for a mere understatement of income does not establish fraud. Carter v. Campbell,264 F.2d 930, 936 (5th Cir. 1959). A consistent pattern of underreporting substantial amounts of income over a period of years is, however, persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Lollis v. Commissioner,595 F.2d 1189, 1191 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. Also, a taxpayer's failure to maintain accurate books and records may also constitute significant evidence of fraud. Lollis v. Commissioner,supra at 1192; Otsuki v. Commissioner,supra at 110. We are satisfied that respondent has carried his burden of proving fraud by clear and convincing evidence for each of the years at issue. Cedrone negotiated an agreement with Marshall entitling him to a commission as manager of the Sewer Project equal to 10 percent of the contract price. In each of the years at issue, Cedrone withdrew from Ron-Ore bank accounts substantial sums of money as both commission and rental income. Whether the withdrawals were cashed, deposited in bank accounts held in Cedrone's name, paid in satisfaction of his personal debts, or paid in satisfaction of the debts *555 of his businesses, each inured to Cedrone's benefit. Cedrone is an experienced and relatively sophisticated businessman who knew that some, if not all, of these withdrawals constituted taxable income. Respondent need not prove the precise amount of underpayments resulting from fraud, but only that there was some underpayment and that some part of it was attributable to fraud. Otsuki v. Commissioner,supra;Estate of Brame v. Commissioner,25 T.C. 824, 831-832 (1956), affd. 256 F.2d 343 (5th Cir. 1958). Cedrone made numerous withdrawals in the name of fictitious payees. While this does not conclusively demonstrate fraudulent intent, it does constitute highly suspicious conduct that is not satisfactorily explained in the record. It may be that Cedrone was partially motivated by a desire to satisfy creditors of his businesses, but we conclude that this same conduct constitutes tax fraud and was undertaken with the intent to avoid payment of taxes known to be owing. In support of his burden of proof with respect to the year 1972, respondent claims that petitioner is estopped from denying fraud because of his criminal conviction under section 7201 for that year. The law is clear *556 that a criminal conviction based upon an indictment charging a willful attempt to evade or defeat tax necessarily carries with it the ultimate factual determination that the underpayment was due to fraud. Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). The result is the same where the taxpayer has been convicted of a section 7201 violation by virtue of his guilty pleas. Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964). Thus, petitioner is estopped from denying the existence of fraud for the year 1972. Pursuant to section 6653(b), an addition to tax for fraud is premised upon the existence of an underpayment of tax required to be shown on a return. In the absence of an underpayment, there is no basis for the addition to tax. Due to Cedrone's loss on the sale of his Scriba, New York, property, there was no underpayment of tax for the year 1970, and thus there is no section 6653(b) addition to tax for that year. For the years 1971 and 1972, we conclude that the underpayment in tax was due to fraud, and that Cedrone is liable for an addition to tax under section 6653(b) for each of those years. The final issue for decision is whether Mrs. Cedrone *557 is liable for the section 6653(b) addition to tax for fraud. Pursuant to section 6653(b)(4), in the case of a joint return, an addition to tax for fraud will not apply with respect to the tax of the spouse unless some part of the underpayment is due to the fraud of such spouse. It is possible that Mrs. Cedrone was unaware of the magnitude of Cedrone's unreported income. We are convinced, however, that "some part of the underpayment" for both 1971 and 1972 is due to fraud on Mrs. Cedrone's part. She was maintaining Ron-Ore's payroll records. She set up bank accounts in which Ron-Ore funds were deposited and held in trust for her sons. She lived in a house that was paid for and improved with Ron-Ore funds concededly owed to Cedrone and omitted from his income. She received, and failed to report, income from investment property partially paid for with Ron-Ore funds. Having listened to Mrs. Cedrone's testimony, and having been impressed by her business acumen and her management of the Cedrone family finances, we hold her to be liable for the section 6653(b) addition to tax for fraud for the years 1971 and 1972. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.
2. "George Sedrick" was a fictitious person; a stamp bearing the signature of "George Sedrick" was used to "sign" Ron-Ore checks on this account. ↩
3. In respondent's brief, Ron-Ore's Marine Midland Bank account number XXX-XX102-7 account number XXX-XX102-7 is referred to as "Marine Account I" and account number XXX-XX321-6 Account I" and account number XXX-XX321-6 is referred to as "Marine Account II." For purposes of convenience, we have reversed these designations throughout this opinion.
4. Checks numbered 2006, 2066, 2268, and 2300 were not issued for the entire net payroll then due, as some employees were paid by separate check. The apparent discrepancies between the gross amount of each check, the net payroll obligations for that week, and the excess cash is explained as follows: ↩
Check No
Check No.
Check No.
Check No.
2006
2066
2268
2300
Gross amount of check
$6,305.31
$6,018.37
$5,570.80
$4,342.96 Net payroll per books
4,453.71
5,107.72
5,327.57
4,812.06 Difference
1,851.60
910.65
243.23
(469.10)
Payroll by other check
527.01
202.75
256.77
1,562.50 Gross amount in
excess of net payroll
$2,378.61
$1,113.40
$ 500.00
$1,093.40 5. The disbursement journal indicates that $1,600 of check number 2247 was allocated to job purchases. We limit the adjustment here to the amount of check number 2247 which respondent included in petitioners' income.
6. Check Number 2501 was not written for the entire net payroll then due, and one employee was paid by check. The apparent discrepancy can be explained as follows: ↩
Net Payroll per books
$1,814.82 Gross check
(960.40)
Check to Employee
(146.30)
Difference - deemed contributed
by petitioners
$ 707.82 7. The disbursement journal indicates that $500 of check number 2471 was allocated to job purchases. We limit the adjustment here to the amount of check number 2471 which respondent included in petitioners' income.↩
8. We do not have the facts before us to determine whether some portion of Cedrone's payments in excess of the nonbusiness bad debts allowed in the years at issue constitute capital contributions to his wholly owned corporations. No single criterion nor any series of criteria can provide a conclusive answer to whether advances are loans or capital contributions. See John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Factors which are of particular significance in making this determination include the capitalization of the corporation, use of the funds advanced, potential sources of repayment and the concomitant risk of nonpayment, and comparability with loans by independent creditors. Gilboy v. Commissioner,T.C. Memo. 1978-114↩. If such payments do constitute capital contributions, then Cedrone may be entitled to additional losses in the year that his stock in such corporations becomes worthless. See sec. 165(g).
9. Basis of $28,000 minus sale proceeds of $4,950 equals $23,050. As discussed above, Cedrone is entitled to a section 166(d) nonbusiness bad debt loss for his payments as guarantor of Chesterlyn's debts. While Cedrone testified that "something like $3,000 or $4,000 worth" of pipe had been purchased from Johns-Manville, there is no evidence as to how much of the $4,950 realized on the sale was used to satisfy Chesterlyn's debts. Thus, we can make no determination as to the amount of Cedrone's 1970 nonbusiness bad debt loss resulting from his obligation as guarantor thereof.
10. Sec. 6013(e)↩ was amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801, with retroactive application to all taxable years to which the Internal Revenue Codes of 1954 and of 1939 apply. See H. Rept. 98-432, (Pt. 2) 1501, 1503 (1984).